770 So.2d 1097 (1999)
Lauren Hope SKIDMORE-SHAFER
v.
Steven Leslie SHAFER.
2980716.
Court of Civil Appeals of Alabama.
October 8, 1999.
Rehearing Denied December 10, 1999.
Certiorari Denied April 14, 2000.
*1098 Raymond C. Bryan, Anniston, for appellant.
George A. Monk of Dillon, Field, Monk & Stedham, P.A., Anniston, for appellee.
Alabama Supreme Court 1990572.
YATES, Judge.
The trial court divorced the parties on December 4, 1996. Pursuant to an agreement of the parties incorporated into the final judgment of divorce, the court, among other things, awarded the parties joint custody of their minor son, with the mother having primary physical custody; established visitation for the father; ordered the father to pay $360 per month in child support; and ordered the father to maintain insurance on his life, naming the child as the beneficiary.
On November 10, 1997, the court, pursuant to a modification agreement reached between the parties, amended the original divorce judgment to increase the father's monthly support obligation to $600 per month, expanded his visitation rights, and clarified his obligation to maintain life insurance.
On July 28, 1998, the father petitioned the court for custody of the child, alleging that there had been a material change in circumstances that would warrant a custody modification. The father also petitioned the court for temporary custody of the child, or, in the alternative, for an ex parte temporary restraining order. The father alleged that the mother had married C.P.H.; that C.P.H.'s visitation rights with a son from a previous marriage had been suspended by the court; that the mother and C.P.H. would be moving to Chattanooga, Tennessee, because of C.P.H.'s employment; and that the child who is the subject of this custody dispute had been subjected to an emotionally unhealthy home environment that was causing the child harm. On that same day, the court entered an order awarding temporary custody of the child to the father and enjoining the mother from removing the child from Calhoun County.
On July 31, 1998, the mother answered the father's petition for a modification and counterclaimed, seeking to have the father found in contempt for his failure to pay the court-ordered child support and his failure to maintain a life insurance policy on his life naming the child as beneficiary. The mother also moved the court to vacate its ex parte order of July 28, 1998. Following an ore tenus proceeding, the court, on August 28, 1998, entered an order setting aside its ex parte order and returned custody of the child to the mother pending a final hearing on the father's petition for a modification of custody.
*1099 Thereafter, following a final hearing on the father's petition, the court, on December 16, 1998, awarded the parties joint custody of the child, with the father having primary physical custody; ordered the mother to pay child support; and established visitation for the mother. The court also denied the mother's counterclaim, declining to find the father in contempt. The mother appeals.
The mother argues that the court erred in awarding custody of the child to the father, because, she says, the evidence was insufficient to warrant a change of custody pursuant to Ex parte McLendon, 455 So.2d 863 (Ala.1984). This court has stated:
"When a noncustodial parent seeks a modification of a prior custody determination, the evidentiary standards set forth in Ex parte McLendon, 455 So.[2d] 863 (Ala.1984), must be applied. The McLendon standard applies when the parents share joint legal custody and a previous judicial determination places primary physical custody of the child with one parent. Scacca v. Scacca, 694 So.2d 1 (Ala.Civ.App.1997); see also Ex parte Bryowsky, 676 So.2d 1322 (Ala. 1996) (holding that McLendon standard applied where agreement between the parties granted the parties joint legal custody of the child, with physical custody to the mother, and agreement was adopted by the trial court). The petitioning parent must show by substantial evidence that a change in custody will materially promote the child's best interests and welfare. Ex parte McLendon, supra, Etheridge v. Etheridge, 712 So.2d 1089 (Ala.Civ.App.1997). The petitioning parent must also show that the good brought about by the change in custody would more than offset the inherently disruptive effect caused by uprooting the child. Ex parte McLendon, supra. The ore tenus rule is applicable to childcustody-modification proceedings, and the court's judgment based on findings of fact will not be reversed absent a showing that the findings are plainly and palpably wrong. Scholl v. Parsons, 655 So.2d 1060 (Ala.Civ.App.1995).
P.A.T. v. K.T.G., 749 So.2d 454, 456 (Ala. Civ.App.1999).
The court's order provides, in part:
"During the child's entire life, he has suffered upper respiratory infections and was diagnosed with asthma in February 1997, at which time he was also hospitalized with pneumonia. Since that time he has been hospitalized three (3) more times for the same problem and has required doctor's office visits in excess of twenty (20) times.
"The [mother] is/was a moderate to heavy smoker, 1-2 packs per day, and at the time of the child's diagnosis the [father] was living [in the house of his parents, and his mother is a smoker]. The [mother] was provided a list of warnings by the doctor, which she also provided to the [father], and which included that the child not be exposed to cigarette smoke. The [mother] testified that she never smoked in the house and never in the car when the child was in the car, nor around the child. The [father] testified that when he would pick up the child from the [mother], his clothes would reek of cigarette smoke. A private investigator hired by the [father] videotaped [the mother] and testified about the [mother's] doing exactly what she had said she did not do. Although both parties and their spouses have used colognes, hair spray, etc., which are on the asthma warning list, it appears that the biggest and most blatant disregard for the health of the child is attributable to the [mother].
"This Court cannot comprehend [that] a parent, knowing that their child suffers from asthma and severe upper respiratory infection problems, with four (4) hospitalizations and twenty (20) plus doctor visits in almost two (2) years, and being warned of the danger of cigarette smoking as it affects the child's asthma as well as the other well-publicized ... *1100 effects of secondhand cigarette smoke, would continue to [smoke], thereby directly contributing to the misery and suffering this child has had to endure. To do this to a child is no less child abuse than if you had deprived him of food or medical treatment.
"[The mother] did testify in the last day of trial that she had quit smoking in the interim ...; however, considering her lack of truthfulness in her prior testimony, the Court is unable to believe her assertions.
". . . .
"Therefore, based on these specific findings and other evidence the Court considered, the Court finds that there has been a material change in circumstances which warrants a change in custody/placement and that the change in placement materially promotes the child's best interests and more than offsets any disruptive effects the change in custody may cause."
At the time of the final hearing, the child was three years old and had a long history of upper-respiratory complications. The child had suffered from bronchitis; a green, runny discharge from his nose; a clogged nose; earaches and ear infections; and a deep cough that would wake him at night. The child was first treated by Dr. Muhamad M. Festok, a pediatrician, in February 1997. At that time, the child was suffering from a green discharge from his nose, a fever "off and on for a month," and a cough. Dr. Festok diagnosed the child with chronic asthma and pneumonia and admitted him to the hospital. Dr. Festok testified that he advises parents of asthmatic children to keep them away from cigarette smoke, animals, fumes, and fragrances, because agents increase the risks of asthma attacks. Dr. Festok's medical records indicate that he treated the child on 23 occasions from February 1997 to June 1998 for asthma and other upper-respiratory-related problems. The child was hospitalized on four occasions during that time.
At the hearing on the mother's motion to set aside the court's ex parte order, she testified that she had been warned that cigarette smoking around the child could aggravate his asthma. She stated that she did not smoke around the child and that no one was allowed to smoke in her home. At the final hearing on the father's petition, the mother again testified that she had been warned not to smoke in the child's presence. Dr. Festok had provided the mother with the following letter in February 1997:
"To Whom It May Concern:
"[The child] is a child with asthma that has also had a case of pneumonia that resulted from this problem. The use of cigarette smoking in the house, whether the smoke be in the same room or another room, still affects the asthma and causes extra problems for [the child]. It is recommended that the use of cigarettes around this child be stopped."
The mother provided this letter to the father, based on her knowledge that at that time the father was living with his mother and that his mother and brother smoked. The mother testified that as of the date of this letter she was aware that it was critical that the child be shielded from cigarette smoke. She stated that she did not smoke at all in her home and that she did not smoke in her automobile or otherwise in the child's presence.
The father testified that although his mother and brother smoked in their home while he was living there, they never smoked in the child's presence. He stated that after he had received the letter from Dr. Festok, the mother and brother stopped smoking in the home altogether. The father testified that neither he nor his current wife smokes and that they do not permit smoking in their home. The father testified that while he was married to the mother she would smoke in the child's presence. He stated that he asked her to stop smoking in the child's presence, but *1101 that she did not. After the parties divorced, the father could no longer monitor whether the mother smoked in the child's presence; however, he stated that when he picked the child up for visitation the child's clothing and belongings smelled of cigarette smoke. The father stated that although the mother had testified under oath in the initial hearing and had denied that she smoked in the child's presence, he was convinced that she still, in fact, continued to smoke in the child's presence and that he had hired a private investigator to prove it.
The investigator watched and videotaped the her on several occasions in September 1998 and October 1998. The videotape evidence demonstrates that the mother continued to smoke in her house, in her automobile, and in the presence of the child. After being confronted with the video evidence, the mother stated that she had smoked because of her "ignorance," that she was sorry and that she was not going to let cigarettes cost her her child. The mother stated that she had stopped smoking and had not smoked in two weeks.
The child has suffered from upper-respiratory problems most of his life and was diagnosed with asthma. The mother was specifically warned of the danger of cigarette smoking in the child's presence. She stated that she appreciated the risks associated with her smoking cigarettes in the child's presence, yet she continued to do so and then attempted to mislead the court as to that fact. After carefully reviewing the entire record, we cannot say that the court erred in awarding primary physical custody of the child to the father. The evidence presented indicates that the change of custody would materially promote the child's best interests and welfare and that the good brought about by the change would offset any disruptive effect caused by uprooting the child. P.A.T., supra. The court's judgment as to this issue is affirmed.
The mother next argues that the court erred in failing to find the father in contempt for his failure to pay child support. The court's November 10, 1997, order increasing the father's support obligation to $600 per month, effective January 1, 1998, specifically stated that the father was credited with payments through December 1997. The mother contended that the father had failed to pay child support for January 1998. The father contended that he had made a support payment in December 1997 and that, because the court's order had credited him with payment through December 1997, the December payment should be credited to his January 1998 obligation. The father also testified that the circuit clerk's office was deducting approximately $137 per week from his paycheck in January 1998 to satisfy his monthly support obligation and that his support obligation for January 1998 was satisfied at the end of the month rather than the beginning of the month.
The court stated in its order that it refused to rule on the issue because neither party had submitted documentary proof of either payment or nonpayment, as the court had directed at the conclusion of the hearing. The mother, however, did submit a document detailing the father's payment history. This document indicates that the father had made his monthly support payments from February 1998 through November 1998. It does not indicate that a payment was made in January 1998. Accordingly, the judgment as to this issue is reversed and the case is remanded for the trial court to consider this evidence and to make a determination whether an arrearage exists.
The mother next argues that the court erred in failing to require the father to maintain a life insurance policy on his life. The original divorce agreement of the parties provided, in part:
"LIFE INSURANCE: The [father] shall provide for the use and benefit of the minor child of the parties, life insurance coverage on [the father's] life. The *1102 [father] shall name the minor child of the parties as full beneficiary on any and all policies of such life insurance, including, but not limited to, insurance benefits through the United States Army and [Bama] Budweiser [Company]. The [father's] obligation herein shall remain in full force and effect until such time as the minor child of the parties reaches the age of twenty-five (25) years or graduates from college, whichever first occurs."
The parties' November 1997 modification agreement provides, in part:
"LIFE INSURANCE: It is acknowledged that the intent of the parties in paragraph 8 of the original agreement is clarified to reflect that [the father] will maintain the minor child of the parties as beneficiary on any and all policies of life insurance which existed upon the date of divorce, however, [the father] shall be free to secure such additional life insurance as he may elect without restriction as to his designation of beneficiary."
At the time the parties divorced, the father was employed by Bama Budweiser and the United States Army Reserve. He maintained a life insurance policy through each employer. Subsequently, the father resigned from the Army Reserve because of a back injury and a work conflict with Bama Budweiser. The father testified that when he resigned his service with the Army Reserve his life insurance policy terminated and he could do nothing to maintain that policy. The father stated that he had not replaced the policy terminated through the Army Reserve. He testified that the policy with Bama Budweiser remained in effect.
The court concluded that the divorce agreement required the father to maintain the child as a beneficiary only on the Army Reserve policy and the Bama Budweiser policy, and did not require him to obtain other coverage should his employment with either entity cease. This court has stated:
"When a trial court adopts a separation agreement, it is merged into the final judgment of divorce. A judgment of divorce is to be interpreted or construed like other written instruments. Whether an agreement is ambiguous is a question of law to be determined by the trial court. If the agreement is susceptible to more than one meaning, then an ambiguity exists. If only one reasonable meaning clearly emerges, then the agreement is unambiguous. If a provision of an agreement is certain and clear, it is the duty of the trial court to determine its meaning. The words of the agreement are to be given their ordinary meaning, and the intentions of the parties are to be derived from them. The interpretation made by the trial court is accorded a heavy presumption of correctness and will not be disturbed unless it is palpably erroneous."
Wimpee v. Wimpee, 641 So.2d 287, 288 (Ala.Civ.App.1994).
After reviewing the agreements, we conclude that the court's interpretation is inconsistent with the intention of the parties. Under the trial court's interpretation, the father, should his employment with Bama Budweiser cease, would not be required to maintain any insurance policy on his life that named the child as a beneficiary. This result is certainly not what the parties intended. We conclude that the proper interpretation of the agreement requires the father to maintain on his life an insurance policy, or insurance policies, providing coverage equivalent to that provided by the policies he had through his employers at the time of the divorce. Therefore, the judgment as to this issue is reversed and the case is remanded for the court to enter an order consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
*1103 ROBERTSON, P.J., and MONROE and THOMPSON, JJ., concur.
CRAWLEY, J., concurs in part and dissents in part.
CRAWLEY, Judge, concurring in part and dissenting in part.
I concur in the affirmance of the judgment modifying custody and in the reversal of the trial court's refusal to rule on the matter of a child-support arrearage. I dissent, however, from the reversal of that portion of the trial court's judgment concluding that the father was not required to obtain other life insurance coverage and to name the child as the beneficiary. I would affirm the trial court's judgment as to the life-insurance issue. See Rau v. Rau, 429 So.2d 593 (Ala.Civ.App.1982). See also Frawley v. U.S. Steel Mining Co., 496 So.2d 731 (Ala.1986); Brown v. Brown, 680 So.2d 321 (Ala.Civ.App.1996).